· No. 2456.

## EX PARTE WILLIAM HENSON.

HABEAS CORPUS FOR BAIL—FACT CASE.—See the statement of the case for evidence adduced in a habeas corpus proceeding for bail under a charge of murder, *held* insufficient to support a judgment denying bail.

HABEAS CORPUS on appeal from the District Court of Wilson. Tried below before the Hon. George McCormick.

The relator was held under a capias charging him with the murder of E. T. Wingate in Wilson county, Texas, on the thirtieth day of April, 1887. Upon the hearing of his writ of habeas corpus bail was refused, and the relator was remanded to the custody or the sheriff. The judgment rendered below is reversed, and, by order of this court, bail is awarded in the sum of five thousand dollars.

John Bryan was the first witness introduced by the relator. He testified that he saw the shooting of Wingate by the relator, which occurred at or near the depot in Floresville, Wilson county, Texas, on the thirtieth day of April, 1887. Wingate, when he was shot, was sitting in his wagon with Mr. Goss. Witness was looking at the relator when the fatal shot was fired, and did not see Wingate when he received the shot, but he thought that at that time Wingate's back was towards the relator. Relator got the Winchester rifle with which he shot Wingate from a scabbard attached to the saddle of a horse standing near the depot. He rested the gun on the horse's back, took deliberate aim and fired. He then reloaded the gun but did not fire again. The relator and Wingate were between forty and fifty feet apart when the fatal shot was fired.

Cross examined, the witness stated that the deceased got out of the wagon after he was shot and went to the depot door, about twenty feet distant, where he sat down for about five minutes before he fell over. Witness reached him about the time he fell over, and, with William Bryant and Thomas, cut his clothes off. The ball entered the back just below the left shoulder blade, and passed entirely through the body. Witness saw no weapons of any kind about the body of the deceased, nor could any be found about the wagon. Witness turned his eyes to deceased immediately after the gun fired, and caught sight of him just after he got to the ground from the wagon. He then had no weapon in his hands, nor was he making any hostile demonstrations towards the relator. Immediately after he was shot Wingate exclaimed: "Give me a gun! He has murdered me! Tell my wife that he assassinated me; shot me in the back!"

Dave Dennis was the next witness for the relator. He testified that he was present when Wingate was killed by the relator. The killing occurred at the railroad depot about a mile and a half from Floresville. Witness and the relator, traveling in different wagons, reached the depot near the same time on the

fatal morning. About two hours before the shooting, witness and the relator started to the jail with the jail guard to see a prisoner. Before getting to the jail the relator declined to go on, because, as he said, Wingate was somewhere about the jail, and he did not want to see him.

John Cryer testified, for the relator, that he went with the relator, in the same wagon to Floresville on the morning of the tragedy. The relator then lived with Bud Cryer, at the latter's house, about five miles from Floresville. Relator told the witness that he was going to the Floresville mill for meal for Mrs. Cryer, the mother of Bud, and the aunt of the witness. Witness was with the relator on that morning until the fatal shot was fired, and knew that the relator and Wingate had no prior meeting on that day. Some two or three weeks before the killing, the witness met Wingate, and Wingate told him that he intended to commence shooting at the relator the first time he got within one hundred yards of him. Witness told the relator of this remark. On the Saturday before the killing, the deceased, while talking to witness, said that the relator was a d—d bastard and that his mother was a d—d old bitch. Witness reported these statements to the relator at the time he told him of the threats, which was during the first part of the same week in which the killing took place. .

Cross-examined, the witness said that Lon and Frank Pennell, the latter as large and as old as witness (seventeen years), were present when Wingate said that he would commence shooting at relator as soon as he approached within a hundred yards of him. A pistol was taken to Floresville in the wagon with witness and relator. On reaching Floresville the relator placed the pistol in his pocket.

Tom West testified, for the relator, that some time in February, 1887, during the pendency of proceedings to place both the deceased and the relator under peace bonds, the deceased, talking to the witness in Floresville, said that he and the relator had agreed not to place each other under peace bonds. In the same connection he said that the relator, whom he characterized as a "d—d son of a bitch" and a "d—d mountain hoosier," whose "mother was a d—d bitch ahead of him," was glad to drop it. He then said that he intended to kill the relator if he ever got in his way; that he would blow relator's brains out if he ever caught him in the right way. Witness told James West and other persons of the statements and threats made by deceased. Witness

had known deceased casually about ten years, and intimately about three years. Deceased's reputation was that of a violent, dangerous and determined man, and one in every respect likely to execute a serious threat.

On his cross examination, the witness said that his feelings towards deceased had not been very friendly for the last year. He had known the relator about ten years. His relations with the relator were friendly only. Tubbs was present and heard the deceased's statements and threats. They were uttered some time after the relator had beaten the deceased with a pole. The relator was about twenty years old, and by marriage was a cousin to witness.

James West testified, for the relator, that his brother, Tom West, told him what the deceased said about the relator and his mother, and that he told the relator, on the day before the killing, that he heard that deceased had been talking badly about his, relator's, mother.

Mrs. George Onslow, for the relator, testified that, in a conversation with Mr. Rose, in her presence, about two weeks before the killing, the deceased said that he intended to kill the relator the first opportunity he got.

Malvin Cryer testified, for the relator, that, at the time of the killing, the relator was living with him, about five miles from Floresville. About a month before the killing, deceased passed the field in which the witness and the relator were at work. When he reached a point on the road opposite the witness and the relator, he discharged his gun. The shot, however, did not pass near witness or the relator. Deceased was then traveling the public road in a wagon. It was not usual for travelers to discharge firearms on the public road. The relator had not been to Floresville for two weeks prior to the killing. The witness intended going to Floresville on that day to get some meal, but, his mother deciding to wash, witness abandoned the trip to help her, and got the relator to go in his stead. The reputation of the deceased was that of a violent, dangerous man.

On his cross examination, this witness said that John Cryer went to Floresville with the relator on the day of the homicide. Witness saw the relator put his pistol in the wagon when he started to Floresville.

James Gentry testified, for the relator, that he lived about a mile and a half from the house of the deceased. On or about March 1, 1887, the deceased, in a conversation in the hearing of

the witness, said: "We heard that Henson and Mr. Clark were going to San Antonio, and that they would camp one night on the road. We went to look for the camp, and, if the man who told us had not lied about where they would camp, we would have found them, and, if we had found them, we would have killed Henson." After that, about April 1, 1887, when the relator was endeavoring to secure the appointment of constable, the deceased said to witness: "Henson need not think that getting to be constable will keep me from killing him. I had just as soon kill an officer as anybody else." Witness often heard the deceased say that the relator's mother was an indecent woman. Witness told Davis Wade of these several statements made by the deceased. .

Mrs. Wingate, the widow of the deceased, testified, for the relator, that the relator lived at the house of the deceased for several months prior to January, 1887. He was absent about three weeks during that time, but returned upon the solicitation of the deceased. The witness had often heard the deceased utter threats against the relator. A school exhibition was held in the neighborhood in April, 1887. The deceased insisted that his daughter Mintie should attend; that he wanted her to see him kill the relator, and that the exhibition would give him a good opportunity to kill him. Mintie declined to attend the exhibition, partly because she did not wish to go, and partly because witness told her that she had better never leave home than be the cause of anybody's death. A short time prior to the killing, the deceased spoke of a dance soon to be given at the house of a Mr. Rose. He said that he thought the relator would attend that dance, and that he would find an opportunity then to kill him. Deceased talked incessantly, almost, day and night, about the relator, charging everything that was bad against him and his mother, and reiterating his intention to kill the relator upon the first opportunity that should present itself. He commanded the witness to write a note to the relator, telling him that he could have and marry Mintie. His purpose in this, he declared, was to entice the relator to the house and kill him. The witness refused to write the note, and the deceased became very angry with her for refusing. The deceased was a very determined man. He had always been truthful to witness, and was a man who, in her opinion, was in every respect calculated and likely to execute a serious threat. He carried arms at nearly all times.

On her cross examination, the witness said that she told Mr.

Spooner, the district attorney, that the only threat she had ever
heard the deceased make was that he would kill the relator
before he should marry Mintie. Witness and deceased had dis-
cussed the possible marriage of their daughter and the relator
prior to the time that the relator knocked deceased down with a
pole, which occurred on the twelfth day of January, 1887. That
difficulty occurred in this wise: On the said January 12, the de-
ceased, then in the horse lot at his place, called to the relator,
who was in the deceased's house, to come to the lot. He called
in an angry manner, using oaths. The relator went to the lot,
and soon the witness heard the deceased talking angrily and
cursing. She heard the relator say: "Ned, I don't think you
ought to talk to me in that way; I always do what I can to
please you." Deceased replied: "God d—n you, I will talk to
you as I please." The witness then looked through the kitchen
door, and saw that deceased had a pole drawn on the relator.
Thinking a fight imminent, she went back into the house,
screaming. When she got quiet she went out to the lot and
found the deceased on the ground with two cuts or bruises on
the head. The relator had mounted one of the deceased's horses
and gone off. The deceased was confined to his bed for some
days by his injuries, during a part of which time his mind was
flighty. During his confinement he required the witness to stop
the cracks in the walls of the house, alleging his fear that the
relator would shoot him through them. On the night of January
16, the fourth night after the collision in the horse lot, and
while deceased was yet confined to the bed, the relator entered
the deceased's house and bed room with a shot gun. The wit-
ness sprang between the relator and the deceased, covering the
deceased's body with her own, and Mr. Tubbs caught the relator.
The deceased did not own a shot gun, Winchester or pistol,
but had Parson Seale's shot gun, and a negro's Winchester
borrowed. During the deceased's confinement with his wounds,
the witness, as directed by him, wrote to W. O. Murray to bor-
row a pistol, for the purpose, the deceased said, of protecting
himself. The negro's Winchester was returned a few days
before the killing. Deceased did not take a gun or other weapon
with him to Floresville, on the fatal day, so far as the witness
knew.

Davis Wade testified, for the relator, that a few days after the
deceased got out of bed after having been knocked down by the
relator, the deceased came to witness's house and told him that

a man told him of the purpose of the relator and a Mr. Clark to go to San Antonio, camping out one night; that he hunted for the camp, and but for his informant lying to him about where the camp would be pitched, he would have found the camp and killed the relator and Clark. He said further that he would embrace the first opportunity to kill the relator, whose mother was a "d—d old whoreing bitch." Witness told these matters to the relator just a week before the killing. Witness had often heard the deceased say that if he ever met the relator in the right place he would shoot him down like a wolf, and he knew that the deceased, who nearly always went armed, bore the reputation of a violent, dangerous man.

Two witnesses testified that the relator and all of his relatives were exceedingly poor, and that the relator could not give a bond exceeding one thousand five hundred dollars.

The relator then closed.

Douglass Goss testified, for the State, that he got into the deceased's wagon about fifty yards from the depot, and occupied a place on the same seat with the deceased. The deceased then drove to the depot, and was in the act of stopping his horses when the witness heard the report of a gun fired behind him. Deceased sprang to his feet instantly, and after standing in his wagon about five seconds got out and walked to the depot door, where he sat down. He then said: "I told you he would shoot me in the back." Just after the gun was fired the witness saw the relator behind a horse, over the back of which he had fired. Deceased was not looking towards the relator, nor was he displaying any weapons or making any demonstrations when he was shot. He had no gun nor pistol in his hand when he was shot. It was possible that deceased may have turned his head and discovered the relator without the witness's knowledge.

J. M. Bates testified, for the State, that he was in his store near the depot in Floresville when the fatal shot was fired. The relator came into the store a few minutes before and asked for a drink of water. After getting a drink he passed out of the store at the back door and walked to the window on the side of the store, through which the witness next saw him with a Winchester rifle in his hand. He placed the rifle over the back of a saddled horse and took deliberate aim. He then lowered the gun and examined it. The witness next saw the smoke from the discharge of the gun, and immediately afterwards the relator passed around the horse and started towards the depot. He was

met by Dennis and Gouger. He still had the gun in his hand, but did not attempt to shoot it a second time. Witness afterwards saw where the ball fired from the gun struck the depot building. A person standing at that point could not see a person standing where the relator stood when he fired the gun. Anderson Smith claimed the horse and gun.

Anderson Smith testified, for the State, that he rode his horse into Floresville about two hours before the killing of Wingate. His Winchester was attached to his saddle. He hitched his horse near the side window of Bates's store. While at his horse the relator came up, took witness's gun from the straps, examined it and asked witness if it was loaded. Witness replied that it had a hull in it. Relator then threw the hull out and a cartridge in and put the gun back in the straps. Just after the shooting witness saw Dennis and Gouger with the relator. Mr. Gouger had witness's gun. On his cross examination, the witness said that it was a common practice for a person meeting another with a gun to examine the gun, throw out empty shells and load it and ask questions about the gun, and that the relator's actions did not excite his suspicion. Before he examined the gun the relator tried to borrow it from the witness.

A. G. Thomas testified, for the State, that he was standing at about the center of the depot building when the fatal shot was fired. On turning when he heard people rushing about, he saw the relator with a gun in his hand standing about midway between Bates's store and the depot. Dennis and Gouger soon reached the relator and disarmed him. They handed the gun to the witness, who took it to the depot. When he reached the depot he saw Wingate sitting in the door, bleeding profusely. Wingate asked witness for the gun, and said: "He has murdered me! Let me kill him. I told you he would shoot me in the back, and you wouldn't believe me." Witness gave the gun to Jennings and went to and examined deceased. The witness described the wound, and said that deceased had no weapons on his person.

W. O. Murray testified, for the State, that he was in Floresville at the time of the homicide. About two hours before the killing he saw the relator standing near the Lopez building. At the same time the deceased was standing near the meat market, about one hundred and twenty feet distant from the relator. There was nothing to obstruct the view between the Lopez building and the meat market, and, while the witness did not know

that the relator then saw the deceased, he knew that if he looked in the direction of the deceased he could have seen him.

E. Y. Seale testified, for the State, that Wingate came into his office on the morning of and before the shooting, and remained about one and a half hours. It was the recollection of the witness that the relator came into witness's office while Wingate was there. A great many people were in and out of the office on that morning. It was possible that relator could have entered and left the office without seeing Wingate.

A. R. Stevenson testified, for the State, that in January or February before the killing, proceedings to place both deceased and the relator under peace bonds were instituted in the justice's court. The friends of the two parties intervened, prevailed upon them to abandon the proceedings, and the complaints against each were dismissed.

*A. J. Williams,* for the relator.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. After a careful consideration of the evidence in this case as it is presented in the record, we are not satisfied that the "proof is evident" that the applicant is guilty of murder in the first degree. We therefore reverse the judgment denying him bail, and grant him bail in the sum of five thousand dollars.

*Ordered accordingly.*